No. 127,390

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS, *ex rel.* KRIS KOBACH, Attorney General,
*Petitioner/Appellee*,

v.

DAVID HARPER, Director of Vehicles, Department of Revenue, in His Official Capacity,
and MARK BURGHART, Secretary of Revenue, in His Official Capacity,
*Respondents/Appellees*,

and

ADAM KELLOGG, KATHRYN REDMAN, JULIANA OPHELIA GONZALES-WAHL, and DOE
INTERVENOR-RESPONDENT 2, on Behalf of Her Minor Child,
*Intervenors-Respondents/Appellants*.

No. 127,522

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS, *ex rel.* KRIS KOBACH, Attorney General,
*Petitioner/Appellee*,

v.

DAVID HARPER, Director of Vehicles, in His Official Capacity,
and MARK BURGHART, Secretary of Revenue, in His Official Capacity,
*Respondents/Appellants*,

and

ADAM KELLOGG, KATHRYN REDMAN, JULIANA OPHELIA GONZALES-WAHL, and DOE
INTERVENOR-RESPONDENT 2, on Behalf of Her Minor Child,
*Intervenors-Respondents/Appellees*.

1

SYLLABUS BY THE COURT

1.

      The extraordinary remedy of mandamus is available only for the purpose of compelling performance of a clearly defined duty—a duty imposed by law and not a duty involving the exercise of discretion. Mandamus is available only as a last resort and only for extraordinary causes.

2.

      If the party seeking a writ of mandamus wants to stay or stop any actions by an official *pending* the determination of the mandamus proceeding, the party may combine the action with a request for preliminary temporary injunctive relief.

3.

      Temporary injunctions are intended to maintain the status quo and prevent harm to a claimed right pending a final determination of the controversy on its merits. They are not meant to determine any controverted right but to prevent injury to a claimed right until a full decision can be made.

4.

      While temporary injunctions serve an important role in preventing immediate harm, a full hearing on the merits by a neutral tribunal ensures that all parties have a fair opportunity to present their case and that a court's final decisions are made based on a comprehensive understanding of the issues.

5.

      Before a court may issue a temporary injunction, the movant has the burden to establish five factors:  (1) a substantial likelihood of eventually prevailing; (2) a reasonable probability exists that the movant will suffer irreparable injury without an

injunction; (3) the movant lacks an adequate legal remedy, such as damages; (4) the threat of injury to the movant outweighs whatever harm the injunction may cause to the respondent; and (5) the injunction will not be against public interest. All of these factors are necessary to obtain a temporary injunction. The absence of any single factor ends the inquiry.

6.

A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction. The moving party must first demonstrate that such an injury is likely before the other requirements for the issuance of an injunction will be considered.

7.

The "reasonable probability" standard is a much lower burden than the applicable burden of proof at a trial. Yet purely speculative harm will not suffice.

8.

A preliminary injunction does not issue automatically and is not meant to restrain an act the injurious consequences of which are merely trifling.

9.

The mere fact that the Attorney General determines that an official or entity is violating a duly enacted law and files a mandamus action is not enough, by itself, to establish irreparable harm.

10.

When the movant fails to first show any irreparable harm in determining whether a preliminary injunction should be issued, there is no need for the court to weigh the harm to the movant with the harm to the respondent.

11.

The legal requirement that the movant has a substantial likelihood of eventually prevailing on the merits before obtaining a preliminary injunction is designed to balance the need to prevent harm before a full trial can be conducted with the recognition that the final outcome of the case remains uncertain. This standard ensures that temporary relief is granted only when there is a significant chance of success, thereby protecting the interests of both parties until a final decision can be made.

12.

Because the word substantial means "considerable in quantity" or "significantly great," there must be some amount of certainty that is more than an equally balanced scale when determining whether the movant has a substantial likelihood of eventually prevailing on the merits to support a preliminary injunction. Just because a movant does not meet this burden, does not mean that they will not be successful, or it is more probable that the respondent will prevail. It simply means that *at this preliminary stage*, at most, the movant's chances are slightly less than even. A full hearing on the merits could easily change that balance.

13.

A writ of mandamus may not be invoked to control discretion, or to enforce a right which is in substantial dispute. That does not mean that some other civil action(s) might not be available to decide the correctness of an official's interpretation of the law, but mandamus is not one of them.

No. 127,390

Appeal from Shawnee District Court; TERESA L. WATSON, judge. Oral argument held January 27, 2025. Opinion filed June 13, 2025. Reversed and remanded with directions.

4

*D.C. Hiegert* and *Karen Leve*, of American Civil Liberties Union Foundation of Kansas, of Overland Park, *Julie A. Murray*, pro hac vice, and *Aditi Fruitwala*, pro hac vice, of the American Civil Liberties Union Foundation, of Washington, D.C., *Rose Saxe*, pro hac vice, and *Bridget Lavender*, pro hac vice, of the same firm, New York, New York, and *Scott C. Hecht* and *Douglas R. Dalgleish*, of Stinson LLP, of Kansas City, Missouri, for intervenors-respondents/appellants.

*Ryan J. Ott*, assistant solicitor general, *Anthony J. Powell*, solicitor general, and *Kris W. Kobach*, attorney general, for petitioner/appellee.

*Patience Crozier*, pro hac vice, of GLBTQ Legal Advocates & Defenders, of Boston, Massachusetts, *Sasha Buchert*, pro hac vice, of Lambda Legal Defense and Education Fund, Inc., of Washington, D.C., *Kimberly A. Havlin*, pro hac vice, of White & Case LLP, of New York, New York, and *Olawale O. Akinmoladun*, of Spencer Fane LLP, of Kansas City, Missouri, for amici curiae GLBTQ Legal Advocates & Defenders and Lambda Legal Defense and Education Fund, Inc.

*Teresa A. Woody*, of Kansas Appleseed Center for Law and Justice, Inc., of Lawrence, and *Priscilla J. Smith*, pro hac vice, of Law Offices of Priscilla J. Smith, of Brooklyn, New York, for amicus curie Information Society Project.

*Mark P. Johnson*, *Harrison M. Rosenthal*, and *Parker B. Bednasek*, of Dentons US LLP, of Kansas City, Missouri, for amici curie Professors Stephen R. McAllister and Richard E. Levy.

## No. 127,522

Appeal from Shawnee District Court; TERESA L. WATSON, judge. Oral argument held January 27, 2025. Opinion filed June 13, 2025. Reversed and remanded with directions.

*Pedro L. Irigonegaray* and *Nicole Revenaugh*, of Irigonegaray & Revenaugh, L.L.P., of Topeka, for respondents/appellants.

*Anthony J. Powell*, solicitor general, *Ryan J. Ott*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for petitioner/appellee.

Before WARNER, C.J., HILL and ARNOLD-BURGER, JJ.

ARNOLD-BURGER, J.: This case is a dispute between two agencies within the executive branch of government—the Attorney General (AG) and the Department of Revenue, Division of Vehicles (KDOR)—over their competing interpretation of a new state law. The AG sought to have the district court order that the KDOR's interpretation of the statute was wrong and that his was correct. The district court granted the AG's request for an injunction pending a decision on the merits and the KDOR has appealed that decision to us.

In addition, the district court allowed several parties to intervene in the case for the sole purpose of challenging the constitutionality of the statute and the application of the statutory construction doctrine of constitutional avoidance. They join in the appeal.

Because we find that the AG has failed to establish irreparable harm to support the issuance of a temporary injunction and has failed to show a substantial likelihood that he will prevail on the merits, we reverse the district court's order and lift the temporary injunction. We find it unnecessary at this stage to address any other issues the parties raise. They will be resolved by the district court on remand.

FACTUAL AND PROCEDURAL HISTORY

In 2023, the Kansas Legislature passed Senate Bill 180, also known as the Women's Bill of Rights Act. The Act is now codified as K.S.A. 2024 Supp. 77-207. See L. 2023, ch. 84, § 1. The law became effective on July 1, 2023, and generally directs Kansas agencies and subdivisions of government to define a person's biological sex for purposes of vital statistic record-keeping in a particular way. After the law was enacted but before it became effective, a legislator sought an advisory opinion from the AG about the law's application to driver's licenses because the law does not specifically mention

6

driver's licenses. Attorney General Kris Kobach issued an advisory opinion that K.S.A. 2024 Supp. 77-207 applied to driver's licenses and required the KDOR to record the sex of the driver as defined in K.S.A. 2024 Supp. 77-207(a) on the front of the driver's license. See Att'y Gen. Op. No. 2023-2.

Disagreeing with the AG's interpretation, the KDOR announced its intent to continue allowing for gender reclassifications of the listed sex on the front of the license. Kansas Dept. of Revenue, https://www.ksrevenue.gov/ [https://web.archive.org/web/20230630014827/https://www.ksrevenue.gov/] ("The enactment of Senate Bill 180 on July 1 will not impact the longstanding procedures for obtaining, renewing, and updating a Kansas driver's license as they pertain to gender markers.").

The AG, on behalf of the State of Kansas, sued the KDOR for a writ of mandamus and an injunction to enforce his interpretation of the statute. The State also moved for a temporary injunction while the suit was pending. A group of intervenors sought and were granted permission to enter the case solely on the issue of the constitutionality of the statute and the statutory construction doctrine of constitutional avoidance. More details of the dispute will be provided as necessary.

After significant discovery, the district court held an evidentiary hearing on the temporary injunction. The court ultimately granted the temporary injunction, and the KDOR and the Intervenors separately appealed the judgment under different case numbers, but raising the same or similar claims and defenses.

Additional facts are provided herein as needed to analyze the legal issues raised.

ANALYSIS

To fully understand what we are being asked to decide in this appeal, it is key to look at how our system resolves disputes such as this.

I.   A MANDAMUS ACTION

The ultimate relief sought by the AG in this case is a writ of mandamus. This is a legal process allowed in all state and federal courts; it is an order from a court to compel a government official to perform a specified duty. See K.S.A. 60-801.

The extraordinary remedy of mandamus is available only for the purpose of compelling performance of a clearly defined duty—a duty imposed by law and not a duty involving the exercise of discretion. Mandamus is available only as a last resort and only for extraordinary causes. *State v. Becker*, 264 Kan. 804, 807, 958 P.2d 627 (1998). It may not be invoked to control discretion, or to enforce a right which is in substantial dispute. *Ambrosier v. Brownback,* 304 Kan. 907, 911, 375 P.3d 1007 (2016) (quoting *Curless v. Board of County Commissioners*, 197 Kan. 580, 581, 419 P.2d 876 [1966]). And, like all civil disputes, it requires a full hearing in a court of law on the merits of the issue presented.

Although mandamus actions are not common, they are also not rare. And they are requested in varying situations. See *Schwab v. Klapper*, 315 Kan. 150, 505 P.3d 345 (2022) (unsuccessful mandamus action brought by State against two district court judges to force them to dismiss cases pending in their judicial districts involving allegations that the Legislature intentionally gerrymandered legislative districts to dilute the minority vote); *Board of Johnson County Comm'rs v. Jordan*, 303 Kan. 844, 370 P.3d 1170 (2016) (County filed successful mandamus action challenging the constitutionality of the method used for valuing real property for ad valorem taxation purposes.); *City of Atchison v.*

8

*Laurie*, 63 Kan. App. 2d 310, 528 P.3d 1007 (2023) (City filed a successful mandamus action to compel the county sheriff to accept prisoners committed to him by the city police.).

So here, the AG brought a mandamus action under K.S.A. 60-801 to compel the KDOR to stop its practice of allowing gender reclassification of the sex designation on a person's driver's license and to require that the sex designation on the driver's license reflect the new definition of biological sex adopted by the Legislature. He brings this action under his "common law" authority as Attorney General, and *not* at the request of the Legislature or the Governor. See K.S.A. 2024 Supp. 75-702(b) (allowing AG to be directed by the Governor or the Legislature to pursue any case in which the State may have an interest).

II.      A TEMPORARY INJUNCTION

If the party seeking a writ of mandamus wants to stay or stop any actions by an official *pending* the determination of the mandamus proceeding, the party may combine the action with a request for injunctive relief. K.S.A. 60-802(a). An injunction is an order issued from the court to do or not do a particular act. Temporary injunctions, like the one requested by the AG, are provisional remedies intended to maintain the status quo and prevent harm to a claimed right pending a final determination of the controversy on its merits. They are not meant to determine any controverted right but to prevent injury to a claimed right until a full decision can be made. *Garetson Brothers v. American Warrior, Inc.*, 51 Kan. App. 2d 370, 389-90, 347 P.3d 687 (2015). It preserves the relative positions of the parties until a full decision on the merits can be made. *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, 619, 440 P.3d 461 (2019). Seeking injunctive relief in conjunction with a writ of mandamus is not required.

9

While temporary injunctions serve an important role in preventing immediate harm, a full hearing on the merits by a neutral tribunal ensures that all parties have a fair opportunity to present their case and that a court's final decisions are made based on a comprehensive understanding of the issues. As such, injunctions are considered an "extraordinary" remedy—meaning they go beyond what is "usual, regular, or customary." Merriam-Webster's Collegiate Dictionary 444 (11th ed. 2020). They allow a party to get relief before a decision has been made on the merits. It puts the judge in a position of prejudging the merits of the case before all the argument is submitted. It is, of course, not a final decision on the merits, but it often guides the litigation. So it is to be used sparingly.

Because the issuance of an injunction is contrary to delaying a decision until there is a fair opportunity to hear all the merits of the case, our courts require extraordinary evidence to support such an order. The movant, here the AG, has the burden to establish five factors: (1) a substantial likelihood of eventually prevailing; (2) a reasonable probability exists that the State will suffer irreparable injury without an injunction; (3) the State lacks an adequate legal remedy, such as damages; (4) the threat of injury to the State outweighs whatever harm the injunction may cause to the KDOR or the Intervenors; and (5) the injunction will not be against public interest. *League of Women Voters of Kansas v. Schwab*, 318 Kan. 777, 791-92, 549 P.3d 363 (2024). And *all* these factors are necessary to obtain a temporary injunction. The absence of any single factor ends the inquiry. See *Steffes v. City of Lawrence*, 284 Kan. 380, 395, 160 P.3d 843 (2007). And for the same reasons stated above, the courts give particular emphasis to the first two of these prerequisites.

> "The likelihood of success and irreparable injury requirements are designed to protect the defendant from erroneous grants of this potent remedy. Eliminating or watering down these two elements is prejudicial to defendants and leads to excessive resort to this remedy. In short, the extraordinary become ordinary. Adhering to the likelihood of

10

success and irreparable injury requirements is, moreover, not only fair to defendants, but facilitates more reliable and sound judicial decision-making. Our legal system is better served by definitive conclusions reached after a full trial, or on summary judgment, than the tentative rulings associated with preliminary injunctions." DiSarro, *Freeze Frame: The Supreme Court's Reaffirmation of the Substantive Principles of Preliminary Injunctions*, 47 Gonz. L. Rev. 51, 97-98 (2011).

We give this background to put this appeal in context. We are not being asked to decide the merits of the mandamus action. In other words, we have not been asked to give an opinion as to which interpretation of the statute is the correct one. We have only been asked to decide whether the AG has met his burden of proof to establish the prerequisites for this potent remedy.

III.    THE DISPUTE

Since at least 2007, when K.S.A. 8-243 was amended to reflect the requirement that a driver's gender appear on their driver's license, the KDOR has permitted changes to the gender classification assigned to individuals obtaining driver's licenses under specific policy guidelines. It is not an automatic process but requires substantial proof and doctors' statements to support the change. In 2023, the Kansas Legislature adopted K.S.A. 77-207, effective July 1, 2023. It directs Kansas agencies to define a person's sex as their biological sex—as further defined in the statute—for purposes of vital statistic record-keeping. K.S.A. 2024 Supp. 77-207(c).

After the law was enacted but before it became effective, a legislator sought an advisory opinion from the AG about the law's application to driver's licenses because the law does not specifically mention driver's licenses. Although we would only be speculating as to the reason for the opinion request, it does not seem merely coincidental that a document printed and distributed by Independent Women's Voice, a proponent of S.B. 180, after May 10, 2023, explicitly claimed that opponents of S.B. 180 were

11

misrepresenting that the legislation required transgender individuals to change the gender marker on their driver's licenses.

> "SB 180 **doesn't change current law** or **create new restrictions**. It simply requires accurate data collection. Data sets have to mean something if analysts are to draw reasonable conclusions about that data.
> "SB 180 does not require Kansans to change their driver's licenses to prevent Kansas from validating gender identity on their license. The state is free to decide how to set data integrity standards, including adding new classifications to mark gender identity."

This was apparently distributed to the legislators in direct response to the testimony, on March 6, 2023, of Ellen Bertels, an attorney with Kansas Legal Services, before the Kansas House Committee on Health and Human Services warned that passage of S.B. 180 would prevent gender marker changes on state-issued identity documents, which would encompass driver's licenses. Minutes of the House Committee on Health and Human Services, March 6, 2023, attach. 5; Minutes of the Senate Committee on Public Health and Welfare, February 15, 2023, attach. 15. The AG also conceded during oral argument that the impetus of S.B. 180 had nothing to do with driver's licenses but was to address the issue of biological men competing against women in sports.

And if that were not clear enough, the testimonies of Hadley Heath Manning and Riley Gaines of the Independent Women's Voice and Jennifer C. Braceras of the Independent Women's Law Center explained that S.B. 180 did *not* apply to the Motor Vehicle Drivers' License Act (which includes K.S.A. 8-240 and K.S.A. 8-243) because, as proponents of the bill, both women stated that the Women's Bill of Rights Act did not change existing law but fortified it. Minutes of the Senate Committee on Public Health and Welfare, February 15, 2023, attach. 2 and 3; Minutes of the House Committee on Health and Human Services, March 6, 2023, attach. 15 and 16.

12

We do not present this evidence to support any findings of legislative intent related to the statutory language used, but merely to put in context how this dispute arose. Despite the disclaimers to the legislators from the proponents, the AG issued an advisory opinion that K.S.A. 2024 Supp. 77-207 applies to driver's licenses, thus prohibiting the sex designation on the front of the driver's license to indicate anything other than the driver's biological sex as defined in the new statute. See Att'y Gen. Op. No. 2023-2. The KDOR quickly disagreed and publicly stated its intention of continuing to maintain its gender reclassification policy

IV.    OUR STANDARD OF REVIEW

Since the district court granted the AG's request for a temporary injunction, this court applies the abuse of discretion standard of review when determining whether the district court was correct. *Downtown Bar and Grill v. State*, 294 Kan. 188, 191, 273 P.3d 709 (2012). A court abuses its discretion when an action taken is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *In re Spradling*, 315 Kan. 552, 590, 509 P.3d 483 (2022). We review any legal conclusions made by the district court under a de novo standard of review. *Downtown Bar and Grill*, 294 Kan. at 191-92.

> "Although abuse of discretion describes a highly deferential standard, it can refer to
> questions of law warranting independent appellate review. Questions of law are presented
> when an appellate court seeks to review the factors and considerations forming a district
> court's discretionary decision." *Kuhn v. Sandoz Pharmaceuticals Corp.*, 270 Kan. 443,
> 456, 14 P.3d 1170 (2000).

And to the extent the district court relied on statutory interpretation, our review is unlimited. *State v. Betts*, 316 Kan. 191, 197, 514 P.3d 341 (2022) (statutory interpretation presents a question of law over which appellate courts have unlimited review).

13

With that background, we begin with a review of the evidence used to support the AG's motion for injunctive relief, particularly the first two factors: (1) the probability of irreparable injury to the State if the injunction is not granted and (2) a substantial likelihood the State will eventually prevail on the merits of its mandamus action.

V. PREREQUISITES TO ISSUANCE OF INJUNCTIVE RELIEF

A. *Irreparable injury*

We begin with an examination of whether the AG established the State would suffer irreparable harm if the injunction were denied. Courts have consistently noted that "'[b]ecause a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.'" *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004). Likewise, because "'a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal.'" 356 F.3d at 1261.

In determining whether a party shows it will suffer an irreparable future injury, the party must only demonstrate that a "reasonable probability" of injury exists. *Steffes*, 284 Kan. at 395. The "reasonable probability" standard is a much lower burden than the applicable burden of proof at a trial. *Idbeis v. Wichita Surgical Specialists*, 285 Kan. 485, 492, 173 P.3d 642 (2007). Requiring proof of certainty of irreparable harm is too high of a standard for parties seeking injunctions. *Board of Leavenworth County Comm'rs v. Whitson*, 281 Kan. 678, 684, 132 P.3d 920 (2006). Yet purely speculative harm will not suffice. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009). Because an injunction is an equitable remedy, it does not issue automatically and is not meant "'to

14

restrain an act the injurious consequences of which are merely trifling.'" *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311, 102 S. Ct. 1798, 72 L. Ed. 2d 91 (1982).

The district court found the State showed a reasonable probability of suffering an irreparable future injury in two ways:  (1) the KDOR's refusal to comply with a duly enacted statute creates an "inherent" irreparable injury because the State's mandamus relief was "designed to compel a public officer's performance of a specific legal duty [under] K.S.A. 60-801"; and (2) allowing the KDOR to continue issuing driver's licenses before a final decision on the merits would cause potentially noncompliant licenses to be in circulation and unable to be recalled for up to six years, thus hindering law enforcement's ability to "identify suspects, victims, wanted persons, missing persons, and others."

We will examine the law and the evidence related to each.

   1. *Inherent irreparable harm*

The AG puts most of his eggs in this basket, even though it was not part of the stated harm in his petition.

   "The primary harm here is [the] KDOR's refusal to comply with a law duly
   enacted by the Legislature. The Kansas Constitution empowers the Legislature to make
   the laws, and it is the executive branch's duty to enforce those laws. Kan. Const. Art. II,
   § 1, Art. I, § 3. The harm that occurs against the State here then is [the] KDOR's refusal
   to comply with K.S.A. 2023 Supp. 77-207 and fulfill its duty to comply with duly
   enacted state law, which serves as the basis for the State's mandamus action."

In other words, the AG asks us to find, as a matter of law, that anytime an AG believes that a person or entity is violating a duly enacted law, we must find irreparable harm sufficient to support the issuance of an injunction. But the problem is that neither

15

the AG nor the district court cite any support for this approach, nor are we able to locate any. Failure to support a point with pertinent authority or failure to show why a point is sound despite a lack of supporting authority or in the face of contrary authority is like failing to brief the issue. *In re Adoption of T.M.M.H.*, 307 Kan. 902, 912, 416 P.3d 999 (2018). Issues not adequately briefed are deemed waived or abandoned. *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018).

All the cases that the AG relies on simply state that the purpose of a mandamus action is to compel an official to perform a specified duty. See *State ex rel. Stephan v. O'Keefe*, 235 Kan. 1022, 1024, 686 P.2d 171 (1984) (writ of mandamus "rests upon the averred and assumed fact that the respondent is not performing or has neglected or refused to perform an act or duty, the performance of which the petitioner is owed as a clear right"); *Stephens v. Van Arsdale*, 227 Kan. 676, 682, 608 P.2d 972 (1980) ("The remedy of mandamus is available only for the purpose of compelling the performance of a clearly defined duty resulting from the office, trust, or official station of the party to whom the other is directed, or from operation of law."); see also *Manhattan Buildings, Inc. v. Hurley*, 231 Kan. 20, 26, 643 P.2d 87 (1982) ("Mandamus is also a proper remedy where the essential purpose of the proceeding is to obtain an authoritative interpretation of the law for the guidance of public officials in their administration of public business . . . .").

The district court reached the same conclusion relying only on the fact that the AG may seek relief through a mandamus action.

Both positions beg the question. See Garner's Dictionary of Legal Usage 105 (3d ed. 2011) (also referred to as the logical fallacy of *petitio principii*—the act of basing "'a conclusion on an assumption that is as much in need of proof or demonstration as the conclusion itself'"). It is to assume the truth of what one seeks to prove in the effort to prove it. Aldisert, Logic for Lawyers, p. 208 (3d ed. 1997).

Here is the State's argument. The AG can file a mandamus action to force an official to perform his duty. The State is irreparably harmed when an official fails to follow his duty. Conclusion: When the AG believes the official has failed to follow his duty, the State suffers irreparable harm.

The AG's entire argument rests on a presumption that the KDOR has violated the law. But, as the State concedes, a decision on a temporary injunction is not a final determination of the merits. See *Idbeis*, 285 Kan. at 492 ("'A temporary injunction merely preserves the status quo *until a final determination of a controversy can be made*.'"). Even if the State has established a likelihood of success, it has not obtained a final determination that the KDOR is violating state law. Under the AG's reasoning, a party would be entitled to a temporary injunction as soon as that party established a substantial likelihood of prevailing in a suit because the other party's conduct would be, by definition, unlawful. This would make the irreparable injury requirement for a temporary injunction superfluous because it would merge with the first factor—substantial likelihood of prevailing on the merits. Consequently, the legality of an adverse party's conduct cannot be what is meant by irreparable harm within the meaning of a temporary injunction. Irreparable harm must mean some tangible consequence of an adverse party's continued behavior, other than the alleged violation of the law. *New Mexico Dept. of Game & Fish v. United States Dept. of the Interior*, 854 F.3d 1236, 1250 (10th Cir. 2017) ("Although irreparable harm 'does not readily lend itself to definition,' 'a plaintiff must demonstrate a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages.'").

The United States Supreme Court has made clear that a preliminary or temporary injunction is an extraordinary equitable remedy that is never awarded as of right. See *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345, 144 S. Ct. 1570, 219 L. Ed. 2d 99 (2024). Likewise, no particular prerequisite to an injunction should be deemed

17

established as a matter of right. As stated, our system favors a decision on the merits, without prejudgment.

Instead, here we have two competing legal interpretations of a statute by two agencies within the executive branch. The AG in this case relies in part on the statutory interpretation he asserts in his own formally issued opinion. But our Supreme Court has long held that while an opinion of an attorney general regarding the proper interpretation of a statute may be persuasive, it is neither conclusive nor binding. *Perry v. Board of Franklin County Comm'rs*, 281 Kan. 801, 812-13, 132 P.3d 1279 (2006). There have been situations in the past where this court and the Kansas Supreme Court disagreed with an attorney general opinion. See 281 Kan. at 812-13; *Southwest Anesthesia Serv., P.A. v. Southwest Med. Ctr.*, 23 Kan. App. 2d 950, 952, 937 P.2d 1257 (1997); *Gorup v. Kansas Public Employees Retirement System*, 3 Kan. App. 2d 676, 678-79, 600 P.2d 1161 (1979). Of course, there are also times of agreement. See *In re Tax Application of Lietz Constr. Co.*, 273 Kan. 890, 902, 47 P.3d 1275 (2002). These examples are provided to establish that we cannot assume simply because the attorney general interprets a statute in a particular way or issues a formal opinion on any number of topics that the courts will agree. Attorney general opinions are not unassailable.

The KDOR, on the other hand, argues they are not violating the statute at all. They are collecting all the information that the statute requires, and the AG is wrong in his interpretation of the statute by equating the definition of the term "sex" in K.S.A. 2024 Supp. 77-207 with the use of the term "gender" in K.S.A. 8-240 and K.S.A. 8-243. But just as we give no deference to the AG's interpretation of a statute, we give no deference to the KDOR's interpretation. See *In re Tax Appeal of Lemons*, 289 Kan. 761, 762, 217 P.3d 41 (2009) ("No significant deference is due to an agency's interpretation or construction of a statute."). Not to belabor this point, but unless the State proves that it will be irreparably harmed otherwise, the justice system favors sorting out the various arguments after a full hearing. Anything else is a carefully crafted exception.

18

The district court committed a legal error by concluding, without any support, that the mere fact that the AG is alleging a violation of a duly enacted state law he has established irreparable harm to support the issuance of an injunction.

2. *Circulation of noncompliant licenses and its potential effect on the identification of suspects, victims, wanted persons, missing persons, and others*

The harm alleged in the AG's memorandum in support of a temporary injunction was (1) inaccurate information on a driver's license could affect where a law enforcement officer can accurately identify a person; (2) "a mismatch between the sex on a warrant and identification could allow a wanted person to escape"; (3) housing a biological female alongside male inmates poses a risk to the female; (4) the biological sex of a donor has a documented effect on the success of a transplant operation; and (5) allowing the practice of using an identifier other than biological sex as defined in K.S.A. 2024 Supp. 77-207 on the front of the license would mean noncompliant licenses could not be clawed back for six years, resulting in continuing the harm already noted.

In contrast to the focus of the AG's position, the district court put most of its eggs in this basket. The court particularly relied on the inability to claw back what may become noncompliant licenses because a driver's license is used to identify suspects, victims, wanted persons, missing persons, and others. Although not said directly, presumably the court agreed with the argument that licenses with a designation other than one required by K.S.A. 2024 Supp. 77-207 would hinder law enforcement in identifying the listed individuals.

"[A]nd more to the point of the instant case, the Attorney General asserts that a reasonable probability of irreparable injury will occur if [the] KDOR is allowed to issue or change driver's licenses that do not display the holder's biological sex at birth pending a final decision on the merits. This is so because most driver's licenses are valid for six years. Once issued, they are out in circulation and would be difficult to retrieve for

19

correction until they expire and must be renewed. And in the two months leading up to the filing of instant action, the number of applications to change the sex designation on a driver's license spiked sharply from just a few per month historically to 71 in May 2023 and 66 in June 2023.

"The Attorney General points to a reasonable probability of irreparable injury to law enforcement because driver's licenses are routinely used to identify suspects, victims, wanted persons, missing persons, and others."

The problem with the district court's finding is that the AG presented *no* evidence to support this claimed injury beyond unsubstantiated speculation.

First, to support the court's conclusion that the AG had met his burden to establish "a reasonable probability of irreparable injury" the judge found that appellate cases are "replete with such references" that driver's licenses are used to identify suspects and victims. But none of the cases the court chose to support its conclusions involved people misidentified due to the sex listed on their driver's license. Few would quibble with the fact that driver's licenses are routinely used for identification—so are passports and birth certificates. That is not the issue. The issue is whether mandatory inclusion of an individual's sex assigned at birth on a driver's license is essential to identification efforts. If so, the AG argues, irreparable harm will ensue if it is allowed to continue until a decision is made on the merits of the differing legal interpretations.

Contrary to the AG's position, the status quo has been to allow the person's gender classification on their driver's license to differ from their biological sex assigned at birth. The KDOR has been allowing this process since 2007, through 5 governors and at least 16 different legislative sessions. If the KDOR is violating the law now, it was violating it then. Yet the AG took no action to stop this alleged irreparable harm for 16 years. No one was able to bring forward *any* instance of the feared harm of misidentification of

20

criminals in the last 16 years or even the potential that it could be a problem. Instead, the evidence was overwhelming that there was no harm.

From 2011 to 2022, the KDOR issued 9,316,937 driver's licenses. During that same time frame, roughly 380 drivers had their sex designation on the front of their licenses changed. This means approximately .004% of driver's licenses issued were changed, assuming an original issue date in that same time period. This would be approximately 34.5 per year. The AG was not able to come up with a single incident in which a person who had the sex designation on their physical driver's license changed evaded arrest, posed a danger to a law enforcement officer, or was not housed appropriately in jail. In fact, in at least the preceding 16 years, no law enforcement officer complained to the KDOR about any problems that have resulted from the changing of the sex designation.

To support the court's conclusion of irreparable harm, the judge referenced the testimony of Sheriff Brian Hill. Sheriff Hill testified that one time—there was no indication of when—he arrested a transgender woman who told him that she was a man. Sheriff Hill relied on that information to run a records check, which failed to reveal the person's criminal history because she was in the system as a woman, not a man. The problem with the example is there was no evidence that Sheriff Hill relied on a driver's license, only the person's outward appearance.

First, we note that this same mistake could be made of a biological female who appears less feminine and more masculine than the average woman. And, second, this did not prevent the person's arrest or the immediate discovery of the correct record as a woman. Third, the jail was able to easily determine the defendant's appropriate jail placement. There was no harm from the example—real or speculative. In fact, when Sheriff Hill was asked by the AG whether he had *any* evidence of *any* specific incident in the last 32 years while an officer or sheriff, wherein an officer had an issue with

21

identification related to a transgender person, his answer was an unequivocal, "No." Sheriff Hill also advised that he realized that people change their names on driver's licenses so they cannot predominantly rely on the name listed either.

Other testimony that the district judge noted to support a finding of irreparable harm was that of the Detention Bureau Commander of the Johnson County Sheriff's Office, Richard Newson. But he testified that his office uses the arrest report, not the driver's license, to identify a person booked into the jail. In other words, according to Commander Newson, the driver's license was not the "major" document they used and, actually, was one "'lower in the level of importance.'" He testified that when dealing with transgender or intersex arrestees, the housing decision is made on a case-by-case basis, and they have developed special procedures in these situations based on a person's "function[al]" genitalia, not "biological sex." He stated that no one had ever escaped from custody based on their transgender sex status. This testimony was apparently elicited in response to the AG's claim in his request for an injunction that "[t]he harmful consequences are most obvious in the context of arrest warrants: a mismatch between the sex on a warrant and identification could allow a wanted person to escape." And finally, when Commander Newson's office was approached by the AG's office to give examples of problems dealing with transgender arrestees, his office informed the AG that they had "spoken to each and every officer in [the] division. At this time there are *zero* examples of the gender affecting any call for service." (Emphasis added.)

Similar testimony was provided by Lieutenant James Burger, with the Johnson County Sheriff's Office. He testified that in his 23 years of employment he had not been made aware of any officer that had a problem with a transgender person and their driver's license.

Finally, Paul Gorges, the Transportation Coordinator for the Kansas Department of Corrections, submitted an affidavit that "KDOC transportation team does not view, use

22

or require a driver's license to verify identity or gender of the new admits, parole violators, or interfacility transports. KDOC relies on the name, date of birth, and social security number."

This testimony was offered *by the AG* to address the AG's allegation that housing a biological female alongside male inmates posed an "outrageous risk that she will be harassed, assaulted, raped, or even murdered." *De Veloz v. Miami-Dade County*, 756 Fed. Appx. 869, 877 (11th Cir. 2018) (unpublished opinion). But relying on the *De Veloz* case illustrates the danger of cherry-picking a case because of one sentence in the opinion that may support a party's cause. *De Veloz* does not even come close to supporting the AG's allegation of irreparable harm based on an inaccurate housing decision. De Veloz sued prison medical personnel. Jail personnel on duty conducted a strip search and declared De Veloz female. Subsequently, prison medical personnel without physically examining De Veloz and "in the face of considerable information that she was a woman" decided that since she was receiving hormone replacement therapy, she was a man, and they housed her with men. 756 Fed. Appx. at 870-71. But De Veloz was a biological female her entire life, the arrest warrant which caused her to be booked into the jail listed her as a female, and she never claimed otherwise. She was receiving hormone replacement therapy prescribed by her doctor to address symptoms of menopause. She was not transgender. She only had female genitalia and she looked female, so the court concluded that she had clearly established harm and causation in the civil litigation. 756 Fed. Appx. at 880-81.

Perhaps because of the dearth of even anecdotal evidence of harm related to housing jail inmates, the district court did not specifically address harm related to misidentification at the jail, even though the AG listed it as one of the harms that would befall the State if the injunction were not issued. And the AG does not discuss it as a separate harm in his brief, so we deem the allegation of harm in jail classification as unsupported and abandoned.

And finally, the district judge noted the testimony of Captain Jim Oehm of the Kansas Highway Patrol. Captain Oehm has been a law enforcement officer for over 28 years. He testified that when making a traffic stop, he either calls in the driver's license number for identification or swipes the driver's license through a machine in his car. He uses a multifaceted approach depending on the situation, but he never relies on just one piece of information, meaning the sex designation on the front of the license would never be the sole factor relied on to identify a driver. And this makes sense.

Kent Selk, Driver Services Manager for the KDOR, testified that the KDOR has a process for allowing name changes and address changes on a driver's license. Drivers are regularly allowed to update the information on their driver's license. For example, addresses can be changed online, so the plastic copy of the license may show a different address than the one in the database. Kansas Dept. of Revenue, Kansas Real ID, https://perma.cc/ZR3Y-GMW5. The law permits such amendments because having up-to-date information on a driver's license, rather than being harmful, is useful for present-day identification. And it is common knowledge that changes are also made related to other physical characteristics. A driver's hair color may change, they may wear contact lenses that are of a different color than the color listed on their driver's license, they may gain or lose weight, or grow a beard or shave. And there is no requirement that the picture on your license "look like" a person of the same sex that is designated on your license. Finally, just as the district judge noted that driver's licenses "are routinely used to identify suspects, victims, wanted persons, missing persons, and others," so too is race. See, e.g., *State v. DeLeon*, No. 125,533, 2023 WL 6531080, at *4 (Kan. App. 2023) (unpublished opinion) (describing victim as "deceased white male"); *State v. Jones*, No. 124,699, 2023 WL 2723295, at *1 (Kan. App. 2023) (unpublished opinion) (describing defendant as "white male with dark hair"). And race is not captured on the front of the driver's license at all, except to the extent the color of one's skin may be evident from their photo.

24

Simply put, on any given day, the driver's license only reflects the information and the photograph provided at the time the license was issued and by the state from which it was issued. And displaying or possessing a fraudulently obtained or altered driver's license is a separate criminal offense. K.S.A. 8-260. The evidence in the record simply does not support the conclusion that gender markers on driver's licenses inhibit law enforcement's ability to identify an individual or to arrest people who violate the law.

Finally, Selk testified that in his 10 years with the KDOR, no law enforcement, customer, the public, or the Secretary of State's office had raised any issues related to the gender reclassification policy and practice. At least 45 states allow gender reclassification of the sex listed on their licenses, so an officer stopping an out-of-state driver would have no way of knowing what the person's "sex" was as defined by K.S.A. 2024 Supp. 77-207 and no reason to question it. So drivers with out-of-state licenses may have a sex listed on the front of their license different from that assigned at birth. The AG does not allege any harm by continuing to allow out-of-state drivers to drive in Kansas. Nor does he make any attempt to argue that Kansas law enforcement faces unique harm from Kansas' drivers. Any harm alleged by the State regarding misidentification would not be alleviated by injunctive relief as long as other states allow gender reclassification.

The district court committed an error of fact by concluding that there was evidence—*any* evidence beyond mere speculation—to support a finding that law enforcement would be immediately hindered in the identification of suspects, victims, wanted persons, missing persons, detainees, and others if the driver's license did not display the driver's sex assigned at birth.

Because the AG fails to first show any irreparable harm in determining whether a preliminary injunction should be issued, there is no need for the court to weigh the harm to the AG with any harm to the KDOR or the Intervenors.

25

In sum, because the district court committed an error of fact which led to an error of law in determining irreparable harm would result if a temporary injunction was not issued, the court abused its discretion.

B. *Substantial likelihood of eventually prevailing on the merits*

The AG contends that it possesses a substantial likelihood of prevailing on the merits because K.S.A. 2024 Supp. 77-207 applies to driver's licenses, as a matter of statutory interpretation. Before launching into whether he is correct, some background is in order.

To prevail, the AG has the burden of establishing that he has a "substantial likelihood of eventually prevailing" on the merits of his claim. *Schwab*, 318 Kan. at 791. Our Supreme Court has not elaborated on the meaning of this phrase, nor has it defined it in terms of a percentage of certainty.

But to "prevail" means to *win* a lawsuit. Black's Law Dictionary 1439 (12th ed. 2024). Because a preponderance of the evidence (51%) is the lowest burden of proof a successful civil litigant must establish to win a lawsuit, it would make sense that the court would have to find that there is at least a 51% chance that the movant will win the lawsuit to justify the issuance of an injunction. Our Supreme Court has described the preponderance of the evidence standard as a finding that "'a fact is more probably true than not true.'" *Gannon v. State*, 298 Kan. 1107, 1124, 319 P.3d 1196 (2014). "Substantial" means "considerable in quantity" or "significantly great." Merriam-Websters Collegiate Dictionary 1245 (11th ed. 2020). These definitions point to some amount of certainty that is more than an equally balanced scale.

We do recognize that not all courts have accepted this approach. In fact, courts describe this burden in a wide variety of ways. See *Winter v. Natural Resources Defense*

*Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008) (likely to succeed on the merits); *Cigna Corporation v. Bricke*r, 103 F.4th 1336, 1343 (8th Cir. 2024) ("A movant shows a likelihood of success on the merits when it demonstrates *a 'fair chance,' not necessarily 'greater than fifty percent*,' that it will ultimately prevail under applicable law." [Emphasis added.]); *K.C. v. Individual Members of Medical Licensing Board of Indiana*, 121 F.4th 604, 614 (7th Cir. 2024) (The movant must demonstrate "'how [it] proposes to prove the key elements of its case,' and evaluate its *chance of success based on this proffer*. [Citation omitted.]" [Emphasis added.]); *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 112 (10th Cir. 2024) (the movant's right to relief must be *clear and unequivocal*); *Di Biase v. SPX Corporation*, 872 F.3d 224, 235 (4th Cir. 2017) ("[S]uccess on the merits is '*likely*' rather than merely 'possible.'" [Emphasis added.]); *Issa v. School District of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017) ("[T]he movant need only prove a 'prima facie case,' not a 'certainty' she'll win."); *Dopp v. Franklin National Bank*, 461 F.2d 873, 878 (2d Cir. 1972) ("a clear showing of probable success"); *Sierra Club v. Hickel*, 433 F.2d 24, 33 (9th Cir. 1970) (Plaintiff must establish a *reasonable certainty* that he will prevail on the merits at a final hearing.), *aff'd sub nom.* 405 U.S. 727, 92 S. Ct. 1361, 31 L. Ed. 2d 636 (1972). But based on our Supreme Court's accepted standard, "substantial likelihood of eventually prevailing," the AG has the burden to establish that he is more likely than not to prevail.

And we would also note that just because a movant does not meet this burden, it does not mean that they will not be successful, or it is more probable that the respondent will prevail. It simply means that *at this stage*, at most, the movant's chances are slightly less than even. A full hearing on the merits could easily change that balance.

The legal requirement that the movant has a substantial likelihood of eventually prevailing on the merits before obtaining a preliminary injunction is designed to balance the need to prevent harm before a full trial can be conducted with the recognition that the outcome of the case remains uncertain. This standard ensures that temporary relief is

27

granted only when there is a significant chance of success, thereby protecting the interests of both parties until a final decision can be made.

### 1. *Unlimited standard of review*

The AG argues that the KDOR is violating a duly enacted state law. Whether there is a substantial likelihood that the AG will eventually prevail depends on how we interpret K.S.A. 8-243 in conjunction with K.S.A. 2024 Supp. 77-207. Statutory construction is a question of law subject to unlimited appellate review. *In re Wrongful Conviction of Spangler*, 318 Kan. 697, 701, 547 P.3d 516 (2024). Put another way, an appellate court owes no deference to the construction a district court or the parties give a statute. *League of Women Voters of Kansas v. Schwab*, 317 Kan. 805, 814, 539 P.3d 1022 (2023). We examine it with fresh eyes.

### 2. *Words matter*

When courts examine statutes to divine their meaning, we are first instructed to interpret the statute to give deference to the intent of the Legislature. But as the AG noted at oral argument, the legislative process is ugly and messy. In his brief he cites the United States Supreme Court opining on how to discern why legislators took a particular action.

> "Trying to discern what motivates legislators individually and collectively invites speculation and risks overlooking the reality that individual [legislators] often pursue multiple and competing purposes, many of which are compromised to secure a law's passage and few of which are fully realized in the final product." *Virginia Uranium Inc. v. Warren*, 587 U.S. 761, 778, 139 S. Ct. 1894, 204 L. Ed. 2d 377 (2019).

See also Cicchini, *The New Absurdity Doctrine*, 125 Penn St. L. Rev. 353, 362 (2021) ("Legislative intent is, in many cases, an elusive concept, thus making any attempt to divine it a fool's errand.").

Because the process is at times chaotic, and there may be many reasons or no reasons why a bill passed with one word rather than another, determining legislative intent is typically ascertained through the statutory language enacted, giving common words their ordinary meanings. *Spangler*, 318 Kan. at 701. When a statute is plain and unambiguous, an appellate court does not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. *Schmidt v. Trademark, Inc.*, 315 Kan. 196, 200, 506 P.3d 267 (2022). We simply examine the words used.

But words matter and context matter. Parsing definitions of words that appear common can often seem silly to those unfamiliar with how legislation is made and interpreted.

> "Lawyers are trained to make arguments about what words mean. Because we are so trained, we can come up with a reasonable argument why *and* means *or*. But *and* does not mean *or*—at least this is so for all people who are not lawyers. Even for lawyers, *and* should never mean *or* in a carefully drafted document." Keller, *In Search of Precision*, 83 J.K.B.A. 10, 10 (November/December 2014).

For example, when trying to determine legislative intent, we consider other statutes around it, related to it, or adopted at the same time to try to reconcile them and understand the context under which the words were chosen. See *Roe v. Phillips County Hospital*, 317 Kan. 1, 5-6, 522 P.3d 277 (2023). We do this because we assume the Legislature acts with full knowledge about the subject matter, including prior and existing law and judicial decisions. *In re M.M.*, 312 Kan. 872, 875, 482 P.3d 583 (2021).

Using these rules and others have resulted in courts finding that in some contexts "shall" actually means "may," or "and" actually means "or." See *State v. Raschke*, 289 Kan. 911, 920-22, 219 P.3d 481 (2009) (recognizing "'shall'" can be either mandatory or directory depending on context); *McMechan v. Everly Roofing, Heating & Air*

*Conditioning, Inc.*, 8 Kan. App. 2d 349, 351, 656 P.2d 797 (1983) (noting that the word "'and'" in a statute may be construed to mean "'or'" depending on the context); see also *State v. Ballard*, 320 Kan. 269, 284-85, 566 P.3d 1092 (2025) (discussing the common definition compared to the statutory definition of "'transient'"); *State v. Mendez*, 319 Kan. 718, Syl. ¶ 2, 559 P.3d 792 (2024) (when statute says taillights "shall display or reflect a red color" it means they must display only a red color, turning "a" into "only a" by looking in part at other statutes dealing with similar subjects).

In this case, we are asked to divine the definitions of the words "sex" and "gender," and "male" and "female"—four words that may at first blush seem as straightforward as "shall" or "may" or "and" or "or"—but may not be so clear when they are considered in context.

Because any statements contemporaneous or otherwise related to the passage of legislation can be unreliable, several methods have been devised to help determine legislative intent. So we will examine the statutes and apply those rules of statutory construction when the meaning is not otherwise clear.

3. *The collection of vital statistics*

Under K.S.A. 2024 Supp. 77-207, any agency that *collects* vital statistics for the purpose of gathering accurate crime and other data must identify any individual who is part of that collected data as either male or female at birth. So we first look at what meets the definition of vital statistics. If the KDOR does not collect vital statistics, then the statute would clearly not apply, making the competing definitions of sex and gender irrelevant for a decision in this case.

The Kansas Department of Health and Environment, Division of Public Health, Office of Vital Statistics (OVS) is charged with the receipt and preservation of vital

statistics for events that occur in Kansas. K.S.A. 2024 Supp. 65-2402. "Vital statistics" are statutorily defined as "data pertaining to birth, adoption, legitimation, death, stillbirth, marriage, divorce, annulment of marriage, induced termination of pregnancy, and data incidental thereto." K.S.A. 65-2401(a). The State of Kansas has no control over vital statistics collected by other states. And OVS has no responsibility for issuance of driver's licenses.

4. *The KDOR collects vital statistics.*

We have no problem finding that the KDOR is a state agency or department that *collects* vital statistics for the purpose of gathering accurate crime or other data.

Even though a driver's license itself has not been defined by the Legislature as a "vital statistic," the KDOR specifically *collects* birth certificates, death certificates, and marriage records to establish proper identification to place on a record that is used to gather crime data—particularly traffic crime. And this information regularly changes for drivers. Drivers may change their name—even if the newly chosen name does not appear on their birth certificate. Or they may need to change data on their driver's license to comply with an amended birth certificate. Up until the adoption of S.B. 180, and as the result of a federal consent decree, the OVS allowed people to amend their Kansas birth certificate to "reflect [a] sex, consistent with their gender identity, without the inclusion of information that would, directly or indirectly, disclose an individual's transgender status on the face of the birth certificate." *Foster v. Stanek*, 689 F. Supp. 3d 975, 979 (D. Kan. 2023).

And it is undisputed that whatever information the KDOR collects it retains. For example, even though a driver changes their driver's license online and the physical license does not reflect the change, the change is maintained in the KDOR's data set for easy access. The KDOR also identifies people as male or female based on their birth

31

certificate, and they maintain that information in addition to any requests to later change their designation and the required supporting documentation for driver's license purposes.

They also collect vital statistics provided to them from other states.

5. *Competing interpretations*

In deciding whether there is a substantial likelihood that the AG will eventually prevail on the merits, it is necessary to examine the competing statutory interpretations and whether one interpretation has a substantial likelihood of tipping the balance in favor of the AG to justify the issuance of a temporary injunction. If we were deciding the merits of the mandamus action, we would pick a side. We would determine which statutory interpretation rubric, if any, was correct. But as already stated, that is not our role here.

So we will examine the plausible approaches in interpreting the statutes to see if one reasonably rises above the rest to justify the extraordinary remedy of injunction.

*Arguments claiming that the statute is not ambiguous*

> *KDOR's position:  The KDOR is not violating K.S.A 2024 Supp. 77-207, regardless of the definitions of sex or gender or male or female.*

The AG claims in his petition that the KDOR is violating K.S.A. 2024 Supp. 77-207 by not placing a person's sex, as defined in K.S.A. 2024 Supp. 77-207(a), on the front of the driver's license. The provision at issue is subsection (c).

> "Any school district, or public school thereof, and any state agency, department
> or office or political subdivision that collects vital statistics for the purposes of complying
> with anti-discrimination laws or for the purpose of gathering accurate public health,

32

crime, economic or other data shall identify each individual who is part of the collected data set as either male or female at birth." K.S.A. 2024 Supp. 77-207(c).

The KDOR disagrees and argues that nothing in the plain language of K.S.A. 2024 Supp. 77-207(a) prevents the KDOR's data set from both identifying an individual as male or female at birth and identifying them differently on the physical driver's license. The testimony was undisputed that even for the .004% of driver's licenses where the "sex" category on the front of the licenses was appropriately changed, the KDOR still maintains records of the original designation. It is all part of the data set maintained by the KDOR and it is accessible to outside agencies such as law enforcement. This is the same with name and address changes. The KDOR even keeps a record of previous driver's license numbers.

To read the statute as the AG suggests is incorrectly reading the final sentence of K.S.A. 2024 Supp. 77-207(c) as "data shall *only* identify each individual who is part of the collected data set as either male or female at birth." And he goes further to opine that only the "sex" as defined in K.S.A. 2024 Supp. 77-207(a) is to be placed on the front of the physical driver's license. That is also not specifically required by the plain language of the statute. If we assume the statute is unambiguous, as both parties claim, an appellate court must refrain from reading something into the statute that is not readily found in its words. *Johnson v. U.S. Food Service*, 312 Kan. 597, 600-01, 478 P.3d 776 (2021).

> *AG's position:  The KDOR is violating K.S.A. 2024 Supp. 77-207 because the words sex and gender are synonymous.*

The AG agrees the statute is unambiguous, but he claims it is because the terms "sex" and "gender" are synonymous. Accordingly, when the statute adopts a universal definition of "sex," the same definition applies to gender. So in effect, K.S.A. 2024 Supp. 77-207 requires the word "gender" in K.S.A. 8-243 is to be replaced with the word "sex" as defined in in K.S.A. 2024 Supp. 77-207.

33

The KDOR responds that the statute is unambiguous because K.S.A. 2024 Supp. 77-207 defines "sex" and not "gender." To say they are the same requires this court to read the term "sex" as "sex or gender." And again, we are not to read something into a statute that is not readily apparent from the words used. *State v. Gomez*, 320 Kan. 3, 13, 561 P.3d 908 (2025).

To evaluate the substantial likelihood that one of the parties will eventually prevail on the merits of this argument, we start with the presumption that when the Legislature revises an existing law, the Legislature intended to change the law as it existed before the amendment. *Stueckemann v. City of Basehor*, 301 Kan. 718, 745, 348 P.3d 526 (2015). And contrary to the AG's argument, the amendments to K.S.A. 8-240 related to the federally adopted REAL ID Act were substantive in nature. The amendments not only changed the word "sex" to "gender," it changed "name" to "full legal name" and "residence address" to "address of principal residence." The 2007 changes could result in different information being listed on a driver's license than would have been listed before the amendment. For example, Butch Smith could no longer have the name he usually uses on his driver's license but would have to list Robert James Smith. If Robert had several houses he could list, the new law would require him to list a particular house, the one that is his "principal" address. So this would suggest that the change from "sex" to "gender" was also a substantive amendment with "gender" having some distinct meaning the Legislature intended to capture beyond "sex."

If, when adopting provisions designed to implement the REAL ID Act, the Kansas Legislature had wanted to narrow the meaning of gender to limit the identification field to the applicant's biological sex assigned at birth, it could have statutorily defined "gender" that way, just as it did address and name. Or the Legislature could have included a definition of "gender" in K.S.A. 2024 Supp. 77-207. But it did not do so in either statute. Instead, K.S.A. 2024 Supp. 77-207 can reasonably be interpreted to be limited to "sex" to the exclusion of "gender." It is not the court's role to "rewrite legislation." *Dougan v.*

34

*McGrew*, 187 Kan. 410, 415, 357 P.2d 319 (1960). It is only by rewriting this statute that we arrive at the conclusion propounded by the AG, that they are identical. We must not read a statute to add something not readily found therein. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 918, 296 P.3d 1106 (2013). The district court similarly read a definition of "gender" into K.S.A. 2024 Supp. 77-207, something it could not do.

Because there are two interpretations of the statute, both leaning toward a finding that the KDOR is not violating the law, we cannot say that, at this stage, there is a substantial likelihood that the AG will eventually prevail on the merits even if the district court, after conducting a hearing on the merits of the AG's mandamus action, finds the statute to be unambiguous.

*Arguments showing the statute is ambiguous*

Only if the statute's language or text is unclear or ambiguous does the court use canons of construction or legislative history to construe the Legislature's intent. *Chalmers v. Burrough*, 314 Kan. 1, 8, 494 P.3d 128 (2021).

K.S.A. 8-240 and K.S.A. 8-243 were amended in 2007 as follows:

> "[K.S.A. 2006 Supp. 8-240](c) Every application shall state the *full legal* name, date of birth, ~~sex~~ *gender* and ~~residence address~~ *address of principal residence* of the applicant, and briefly describe the applicant, and shall state whether the applicant has been licensed as a driver prior to such application, and, if so, when and by what state or country." L. 2007, ch. 160, § 4.

> "[K.S.A. 2006 Supp. 8-243](a) Upon payment of the required fee, the [KDOR] shall issue to every applicant qualifying under the provisions of this act the driver's license as applied for by the applicant. Such license shall bear the class or classes of

35

motor vehicles which the licensee is entitled to drive, a distinguishing number assigned to the licensee, the *full legal* name, date of birth, ~~residence address,~~ *gender, address of principal residence* and a brief description of the licensee, a colored *digital* photograph of the licensee, a facsimile of the signature of the licensee ~~or a space upon which the licensee shall write such licensee's usual signature with pen and ink immediately upon receipt of the license~~ and the statement [related to being an organ donor]." L. 2007, ch. 160, § 5.

But since 2002, when the notation could be made on one's driver's license regarding the organ donor registry, see K.S.A. 8-247, the Legislature used the term "gender" as part of the information the KDOR needed to forward to the organ donor registry. L. 2002, ch. 60, § 2. So the term "gender" was used in the Motor Vehicle Drivers' License Act at the same time other provisions used the term "sex" and well before the amendment from "sex" to "gender" in 2007 in K.S.A. 8-240.

And, in 2023, the Legislature adopted K.S.A. 77-207:

"(a) Notwithstanding any provision of state law to the contrary, with respect to the application of an individual's biological sex pursuant to any state law or rules and regulations, the following shall apply:

(1) An individual's 'sex' means such individual's biological sex, either male or female, at birth.

(2) a 'female' is an individual whose biological reproductive system is developed to produce ova, and a 'male' is an individual whose biological reproductive system is developed to fertilize the ova of a female . . . .

. . . .

(7) an individual born with a medically verifiable diagnosis of 'disorder/differences in sex development' shall be provided legal protections and accommodations afforded under the Americans with disabilities act and applicable Kansas statutes." K.S.A. 2024 Supp. 77-207.

The AG argues that when the Legislature started using the term "gender" instead of "sex" in 2007 it was an amendment without a difference and was only done to comply with the REAL ID Act. REAL ID Act of 2005, Pub. L. No. 109-13, div. B, Title II, § 202[b], 119 Stat. 311 (codified at 49 U.S.C. § 30301 Note [Improved Security for Drivers' Licenses and Personal Identification Cards, § 202]). He argues that gender and sex mean the same thing and, at least in 2007, the Legislature would not have realized there may be different definitions for the two words. And in 2023, he argued, the Legislature apparently just "didn't want to get into the weeds" and clearly did not consider every angle. So he contends, when K.S.A. 77-207 was adopted, there was no need to provide a separate definition for gender or include gender in the definition of "sex," because the Legislature believed—or wanted to believe—that they were the same thing.

No one seems to dispute that in common parlance, at least in 2007, the two terms were often, but not always, used interchangeably. No one disputes that the 2007 amendments and the replacement of the word "sex" with the word "gender" were meant to bring the state law in compliance with the REAL ID Act.

But neither of these concessions answers whether the Legislature recognized two distinct definitions when they chose to include the term "gender" in the 2007 amendments and then did not include it in the overarching definition of "sex" in 2023—a definition that is very specific. This is where the ambiguity lies. And this is why a court may be justified in resorting to our rules of statutory construction. As noted, there may be many reasons or no reasons why a bill passed with one word rather than another, and we simply cannot assume that the Legislature sloppily and hastily adopted legislation with a complete lack of awareness of the context, the other times they had used the same or similar words, and legal interpretations and agency practices that have developed. We must and do give our committed public servants in the Legislature more credit than that.

37

Accordingly, we find that when ruling on the merits of the AG's mandamus action, a court could reasonably find K.S.A. 2024 Supp. 77-207 ambiguous and resort to our canons of statutory construction to determine legislative intent.

*When the Legislature revises an existing law, the court presumes that the Legislature intends to change the law as it existed before the amendment.*

When the Legislature revises an existing law, the court presumes that the Legislature intends to change the law as it existed before the amendment. *Stueckemann*, 301 Kan. at 745.

The district court held, and the State argues, that the change in terminology was simply a wholesale adoption of the terminology of the federally adopted REAL ID Act to ensure compliance with federal identification requirements. If this was so, then the court must look to the meaning ascribed to "gender" by Congress. The AG cannot accept that the change was based on the federal requirements of the REAL ID Act and then divorce himself from the specifics of the new terminology.

Although the Act required the use of the term "gender," Congress did not explicitly define "gender" but permitted each state to implement its own definition for the term. See 6 C.F.R. § 37.17(c) (2022). By doing so, Congress left the potential for "gender" to have a broader meaning than the scope of the terms "sex" or "biological sex" to accommodate states that did not define gender in purely binary terms. See, e.g., *Eknes-Tucker v. Governor of Alabama*, 114 F.4th 1241, 1265 (11th Cir. 2024) (Lagoa, J., concurring) (distinguishing "sex," an immutable characteristic, from "gender"); *Grimm v. Gloucester County School Board*, 972 F.3d 586, 594-95 (4th Cir. 2020) (discussing difference between sex assigned at birth and gender identity). Accordingly, as used in the REAL ID Act, "gender" is not equivalent to "sex" because it is not universally defined as one's biological sex assigned at birth.

38

While Congress left the term "gender" undefined, permitting each state to establish its own definition, the Kansas Legislature did not define it.

*As early as 2002, our Supreme Court recognized differing definitions of the term sex.*

Courts generally presume that the Legislature acts with full knowledge about the statutory subject matter, including prior and existing law and judicial decisions interpreting the same. *In re M.M.*, 312 Kan. at 875.

Five years before the 2007 amendments to K.S.A. 8-240 were made to comply with the 2005 REAL ID Act, the Kansas Supreme Court first grappled with the issue of transgender Kansans in *In re Estate of Gardinier*, 273 Kan. 191, 42 P.3d 120 (2002). Gardinier married a post-operative male-to-female transexual, J'Noel. When Gardinier died intestate, his son moved to have the marriage declared void so he would inherit his father's estate. The issue was what was meant by K.S.A. 2001 Supp. 23-101, which said that a marriage contract, to be legal, had to be between two parties "'who are of opposite sex.'" 273 Kan. at 198. J'Noel had sex-reassignment surgery several years before the marriage and had her Wisconsin birth certificate changed to reflect her sex as female.

The court discussed cases around the country and the world that made distinctions between sex and gender. It discussed intersex conditions like chromosomal sex disorders, gonadal sex disorders, internal organ anomalies, external organ anomalies, hormonal disorders, gender identity disorder, and unintentioned amputation. It discussed whether sex was a matter of law or a matter of fact. See 273 Kan. at 208. It discussed the related Court of Appeals review of various situations which make sexual identification at birth difficult.

"In chromosomal sex disorders, the chromosomal pattern does not fit into the XX and XY binary system. Among the chromosomal sex disorders described by Greenberg are

Klinefelter Syndrome, which affects approximately 1 in 500 to 1,000 babies identified at birth as males based on the appearance of external genitalia, in which multiple X chromosomes may become manifest in puberty with breast development. Turner Syndrome affects babies identified at birth as females, who in fact typically have only one X chromosome. As a result, a person with Turner Syndrome will have female appearing genitalia but may have unformed and nonfunctioning gonads. What the district court said about J'Noel, that '[t]here is no womb, cervix or ovaries,' also could be true for a person with Turner Syndrome who had been identified as a female at birth." 273 Kan. at 209.

The Supreme Court concluded in 2002:

"The words 'sex,' 'male,' and 'female' are words in common usage and understood by the general population. Black's Law Dictionary, 1375 (6th ed. 1999) defines 'sex' as '[t]he sum of the peculiarities of structure and function that distinguish a male from a female organism; the character of being male or female.' Webster's New Twentieth Century Dictionary (2nd ed. 1970) states the initial definition of sex as 'either of the two divisions of organisms distinguished as male or female; males or females (especially men or women) collectively.' 'Male' is defined as 'designating or of the sex that fertilizes the ovum and begets offspring:  opposed to *female*.' 'Female' is defined as 'designating or of the sex that produces ova and bears offspring:  opposed to *male*.'" 273 Kan. at 212-23.

The Supreme Court held that under the plain language of the statute J'Noel was not of the opposite sex as Gardinier because she did not produce ova or bear offspring under the Webster Dictionary definition at the time. But the court concluded:

"Finally, we recognize that J'Noel has traveled a long and difficult road. J'Noel has undergone electrolysis, thermolysis, tracheal shave, hormone injections, extensive counseling, and reassignment surgery. Unfortunately, after all that, J'Noel remains a transsexual, and a male for purposes of marriage under K.S.A. 2001 Supp. 23-101. We are not blind to the stress and pain experienced by one who is born a male but perceives oneself as a female. We recognize that there are people who do not fit neatly into the commonly recognized category of male or female, and to many life becomes an ordeal.

40

However, the validity of J'Noel's marriage to Marshall is a question of public policy to be addressed by the legislature and not by this court." 273 Kan. at 215.

The statute remains the same today. See K.S.A. 23-2501. Yet after the decision in *Obergefell v. Hodges*, 576 U.S. 644, 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015), this statute as well as K.S.A. 23-2508 was declared unconstitutional. *Marie v. Mosier*, 122 F. Supp. 3d 1085, 1112-13 (D. Kan. 2015).

> *After passage of the 2007 amendments, the KDOR began interpreting "gender" as different than biological sex and started allowing gender reclassifications on Kansas driver's licenses.*

In 2007, the KDOR adopted a procedure allowing drivers to change their gender classification on their driver's license. The policy was updated and refined several times over the years. This was consistent with the procedures developed by the overwhelming majority of other states. The KDOR looks to the American Association of Motor Vehicle Administrators (AAMVA) for guidance. The AAMVA has a Resource Guide on Gender Designation. By 2016, the Resource Guide listed 45 states and the District of Columbia as allowing gender reclassification on driver's licenses and identification cards. The remaining five were listed as "unknown." The majority of these policies were put in place after the adoption of the REAL ID Act in 2005. Although the word "sex" is required to be on the front of the driver's license, the sex designation can change based on gender reclassification. Selk testified that sex and gender are not considered to be the same thing.

Nothing suggests that this change in policy in 2007 was hidden from the AG or the Legislature. Yet the AG took no action at that time to file a mandamus action to force an interpretation consistent with the terms "sex" and "gender" being synonymous. Nor did the Legislature. Nor, as mentioned earlier in this opinion, was any evidence presented that this gender reclassification policy was causing harm to the State or hindering law enforcement in the 16 years between 2007 and the request for injunctive relief in 2023.

*In 2019, the State became a signatory to a federal consent decree requiring the Office of Vital Statistics (OVS) to allow gender reclassifications on State-issued birth certificates.*

On October 15, 2018, a federal lawsuit was filed against several state officials with the OVS. The plaintiffs challenged the state's birth certificate policy. They alleged that no statute or regulation prohibited the correction of the gender marker on a birth certificate in order to accurately reflect the sex of a transgender person. Plaintiffs claimed that the state's policy violated several provisions of the United States Constitution.

Subsequently, and acting on the parties' joint request, the United States District Court of Kansas adopted the parties' proposed consent decree. The parties (which included State officials) indicated that they "intend this Consent Judgment to benefit all Kansans, including transgender people born in Kansas, and to be binding on Defendants unless and until modified by the Court." In relevant part, it provides:

"1. Kansas statutes and regulations hereinafter referred to as 'Kansas's Birth Certificate Policy', which prohibit[ ] transgender people born in Kansas from obtaining birth certificates reflecting their true sex, consistent with their gender identity, violate[ ] the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

"2. Defendants, their officers, employees, and agents; all persons acting in active concert or participation with any Defendant, or under any Defendant's supervision, direction, or control; and all other persons within the scope of Federal Rule of Civil Procedure 65, are permanently enjoined from enforcing the Birth Certificate Policy, and shall provide certified copies of birth certificates to transgender individuals that accurately reflect their sex, consistent with their gender identity, without the inclusion of information that would, directly or indirectly, disclose an individual's transgender status on the face of the birth certificate;

"3. Defendants, their officers, employees, and agents; all persons acting in active concert or participation with any Defendant, or under any Defendant's supervision, direction, or control; and all other persons within the scope of Federal Rule of Civil Procedure

65, shall adopt and enforce a policy whereby a transgender person born in Kansas may obtain a certified copy of that person's birth certificate that reflects a change in sex designation, reflecting their true sex, consistent with their gender identity, by submitting a sworn statement requesting such change and accompanied by: (1) a passport that reflects the person's true sex; or (2) a driver's license that reflects the person's true sex; or (3) a certification issued by a healthcare professional or mental health professional with whom the person has a doctor-patient relationship stating that based on his or her professional opinion the true gender identity of the applicant and that it is expected that this will continue to be the gender with which the applicant will identify in the future[;]

"4. The Kansas Department of Health and Environment's Office of Vital Statistics shall issue certified copies of birth certificates that reflect the change in sex designation to plaintiffs Nyla Foster, Luc Bensimon, Jessica Hicklin, and C.K. that reflect their true sex, consistent with their gender identity, respectively.

"5. The obligations and this Consent Judgment apply to and are binding upon the Defendants and any successors charged with enforcing laws regarding birth certificates." *Foster*, 689 F. Supp. 3d at 979-80.

The consent decree was lifted in 2023, at the AG's request, because S.B. 180 changed the law in a way that could not have been foreseen when the consent decree was entered. But the federal court specifically declined to rule on the constitutionality of S.B. 180 at this time, leaving it instead to this court. 689 F. Supp. 3d at 985 ("[A] dispute about the meaning of Kansas law belongs in a Kansas state courthouse. And in parallel litigation pending right now in Kansas state court, Kansas state officials are litigating their disputes about S.B. 180's meaning.").

This history does not necessarily import any conclusive construction to the statute at issue in this case. But the 2019 federal consent decree against the State, along with the State's admissions therein, serve as an indication that the AG and legislators knew of this issue of gender reclassification and differing definitions of "sex" and "gender" years

43

before S.B. 180 was passed. Yet S.B. 180 did not include a definition for "gender" and remained silent on the relationship between "gender" and "sex."

In sum, by 2023, the Legislature was publicly and legally on notice of the requirements of the REAL ID Act, the Supreme Court's decision recognizing differing definitions of the term "sex," KDOR policy allowing gender reclassification on driver's licenses, and the federal consent decree requiring gender reclassification on Kansas birth certificates. Yet they chose not to include a different definition for "gender" as used in K.S.A. 8-240 and K.S.A 8-243 nor did they equate the terms "gender" and "sex" in their new overarching definitional section that became K.S.A. 77-207. This leads to a reasonable conclusion that the Legislature did not intend for the definition of "gender" to be the same as their new definition of "sex" or they would have made their intentions clear.

> *The same legislative session that saw the adoption of K.S.A. 77-207 adopted other uses of the term "gender" and competing definitions of the term "sex."*

As already stated, when trying to determine the legislative intent of a statute, we consider other statutes around it, related to it, or adopted at the same time to try to reconcile them and understand the context under which the words were chosen. See *Roe*, 317 Kan. at 5-6. So we look at what other statutes were passed in the 2023 legislative session. There were several that used the terms sex and gender in the same statute, and adopted varying definitions of biological sex, and male and female, implying different meanings.

Again, for context, let's revisit K.S.A. 2024 Supp. 77-207:

"(a) Notwithstanding any provision of state law to the contrary, with respect to the application of an individual's biological sex pursuant to any state law or rules and regulations, the following shall apply:

(1) An individual's **'sex' means such individual's biological sex**, either male or female, at birth;

(2) a 'female' is an individual whose biological reproductive system **is developed** to produce ova, and a 'male' is an individual whose biological reproductive system **is developed** to fertilize the ova of a female." (Emphases added.)

Now, let's compare other uses of the term sex and gender in the same legislative session.

*K.S.A. 2024 Supp. 75-42a01, effective July 1, 2023*

The Kansas Public Investments and Contracts Protection Act was passed in the same legislative session as S.B. 180. It contains the recognition of gender in the following definitions:

"(4) 'Environmental, social and governance criteria' means any criterion that gives preferential treatment or discriminates based on whether a company meets or fails to meet one or more of the following criteria:

. . . .

(H) facilitating or assisting or not facilitating or assisting employees in obtaining abortions or **gender** reassignment services; and

. . . .

"(7)[(C)](iv) accessing abortion, **sex** or **gender** change or transgender surgery." (Emphases added.) K.S.A. 2024 Supp. 75-42a01(b).

Thus, using sex and gender in the same sentence connected by an "or" implies they are two different things.

*K.S.A. 2024 Supp. 72-6286, effective July 1, 2023*

This new statute dealing with overnight accommodations during school district sponsored travel contains a brand-new definition of biological sex departing from the definition in K.S.A. 2024 Supp. 77-207, adopted at the same time. It includes within its definition of "biological sex" a statement that biological sex is one thing and gender is another which is not included in the definition of sex.

> "(a) The board of education of each school district shall adopt a policy requiring that separate overnight accommodations be provided for students of each **biological sex** during school district sponsored travel that requires overnight stays by students.
> . . . .
> "(c) As used in this section:
> (1) 'Biological sex' means the biological indication of male and female in the context of reproductive potential or capacity, such as sex chromosomes, naturally occurring sex hormones, gonads and **nonambiguous internal and external genitalia** present at birth, without regard to an individual's psychological, chosen or subjective experience of **gender**." (Emphases added). K.S.A. 2024 Supp. 72-6286.

*K.S.A. 2024 Supp. 60-5602, effective July 1, 2023*

This new statute provides definitions for words used in the newly adopted Fairness in Women's Sports Act and contains the same definition of biological sex as that in K.S.A. 2024 Supp. 72-6286.

*K.S.A. 19-1903, effective July 1, 2023*

Also a new statute, dealing with separation of the sexes in jails, reverts to the same language as K.S.A. 2024 Supp. 77-207. It requires that the sheriff of the county or the

46

sheriff's deputy keep separate rooms for each sex, female and male. It proceeds to define the terms:

"'[S]ex' means an individual's biological sex, either male or female, at birth. A 'female' is an individual whose biological reproductive system **is developed** to produce ova, and a 'male' is an individual whose biological reproductive system **is developed** to fertilize the ova of a female." (Emphases added.) K.S.A. 19-1903(b).

But see National PREA Resource Center, DOJ Interpretive Guidance, Frequently Asked questions, Standard 115.42 (March 24, 2016) https://www.prearesourcecenter.org/frequently-asked-questions?page=4 ("Any written policy or actual practice that assigns transgender or intersex inmates to gender-specific facilities, housing units, or programs based solely on their external genital anatomy violates the standard. . . . A policy must give 'serious consideration' to transgender or intersex inmates' own views with respect to safety. The assessment, therefore, must consider the transgender or intersex inmate's gender identity—that is, if the inmate self-identifies as either male or female. . . . [A] facility should not make determination about housing for a transgender or intersex inmate based primarily on the complaints of other inmates or staff when those complaints are based on gender identity.").

These statutes, adopted at the same time as K.S.A. 2024 Supp. 77-207, point to an understanding by the Legislature that gender and sex are not the same thing and a recognition that the terms "male" and "female" can have different meanings than the meanings assigned in K.S.A. 2024 Supp. 77-207.

Stated another way, if the Legislature intended the terms "sex" and "gender" to mean the same thing, why did it—during the very same legislative session—list them separately in K.S.A. 2024 Supp. 75-42a01? And if it meant "sex" to always only mean male and female as defined in K.S.A. 2024 Supp. 77-207, why did it adopt a separate

47

definition of "'[b]iological sex'" in K.S.A. 2024 Supp. 72-6286 and K.S.A. 2024 Supp. 60-5602 to apply to only those with the appropriate sex chromosomes and nonambiguous genitalia at birth? A reasonable conclusion is that it did so because it recognized a difference between the terms "gender" and "sex." And the specific exclusion of the term "gender" from the definition of "biological sex" means that the Legislature did *not want* them to be confused as synonymous.

>*The Kansas Legislature has recently adopted new and competing definitions of sex and gender.*

Two legislative sessions have passed while this lawsuit has been pending. During that time, the Kansas Legislature was free to adopt language clarifying its intent regarding "sex" and "gender" in K.S.A. 2024 Supp. 77-207. But it has not done so. Instead, the Legislature has adopted new and competing definitions of sex and gender, defining sex and gender as two different things, adding to the confusion of whether "gender" in K.S.A. 8-240 and K.S.A. 8-243 should be described to mean the same as "sex" in K.S.A. 2024 Supp. 77-207. A statutory amendment may provide insight into the original enactment's legislative intent if that enactment was ambiguous. *Brennan v. Kansas Insurance Guaranty Ass'n*, 293 Kan. 446, 458, 264 P.3d 102 (2011).

>*S.B. 63, effective February 20, 2025*

S.B. 63, effective February 20, 2025, contained many pertinent changes in the definitions to sex and gender. The statute, referred to as the Help Not Harm Act, does not amend any existing statutes; it establishes new, yet unnumbered, statutes containing the following definitions:

>"(2) 'Female' means an individual who is a member of the female sex.
>"(3) '**Gender**' means the psychological, behavioral, social and cultural aspects of being male or female.

48

"(4) 'Gender dysphoria' is the diagnosis of gender dysphoria in the fifth edition of the diagnostic and statistical manual of mental disorders.

. . . .

"(6) 'Male' means an individual who is a member of the male sex.

"(7) 'Perceived sex' is an individual's internal sense of such individual's sex.

"(8) 'Perceived gender' is an individual's internal sense of such individual's gender.

"(9) '**Sex**' means the biological indication of male and female in the context of **reproductive potential or capacity**, including sex chromosomes, naturally occurring sex hormones, gonads and **nonambiguous** internal and external genitalia present at birth, without regard to an individual's psychological, chosen or subjective experience of gender." (Emphases added.) L. 2025 , ch. 1, § 1.

And the same bill states:

"(a) A recipient of state funds shall not use such funds to provide or subsidize medication or surgery as provided in section 3, and amendments thereto, as a treatment for a child's perception of **gender** or **sex** that is inconsistent with such child's sex.

"(b) An individual or entity that receives state funds to pay for or subsidize the treatment of children for psychological conditions, including gender dysphoria, shall not prescribe, dispense or administer medication or perform surgery as provided in section 3, and amendments thereto, or provide a referral to another healthcare provider for such medication or surgery for a child whose **perceived gender** or **perceived sex** is inconsistent with such child's sex.

"(c) The Kansas program of medical assistance and its managed care organizations shall not reimburse or provide coverage for medication or surgery as provided in section 3, and amendments thereto, as a treatment for a child whose **perceived gender** or **perceived sex** is inconsistent with such child's sex.

"(d) Except to the extent required by the first amendment to the United States constitution, a state property, facility or building shall not be used to promote or advocate the use of social transitioning, medication or surgery as provided in section 3, and amendments thereto, as a treatment for a child whose **perceived gender** or **perceived sex** is inconsistent with such child's sex.

"(e) A state property, facility or building shall not be used to prescribe, dispense or administer medication or perform surgery as provided in section 3, and amendments thereto, as a treatment for a child whose **perceived gender** or **perceived sex** is inconsistent with such child's sex.

"(f) A state employee whose official duties include the care of children shall not, while engaged in those official duties, promote the use of social transitioning or provide or promote medication or surgery as provided in section 3, and amendments thereto, as a treatment for a child whose **perceived gender** or **perceived sex** is inconsistent with such child's sex." (Emphases added.) L. 2025, ch. 1, § 2.

And finally, the same bill recognizes that there may be people born with a medically verifiable disorder of sexual development.

"(c) The treatments prohibited by subsections (a) and (b) shall not apply to treatment provided for other purposes, including:

(1) Treatment for individuals born with a medically verifiable disorder of sex development, including:

(A) An individual born with external biological sex characteristics that are **irresolvably ambiguous**, including an individual born with 46 XX chromosomes with virilization, 46 XY chromosomes with under virilization or having both ovarian and testicular tissue; or

(B) an individual whom a physician has otherwise diagnosed with a disorder of sexual development that the physician has determined through genetic or biochemical testing **that such individual does not have normal sex chromosome structure, sex steroid hormone production or sex steroid hormone action for a male or female.**" (Emphases added.) L. 2025, ch. 1, § 3.

Just as in the statutory changes made in 2023, these new provisions seem to recognize that a person's internal and external genitalia present at birth could be ambiguous. "Biological sex" would only mean one assigned when the baby has nonambiguous genitalia. And if it did not before, it now makes it clear that the Legislature recognizes a difference between gender and sex. None of the bills adopted in

2025 equate gender as used in the driver's license provisions with the definition of "sex" in K.S.A. 2024 Supp. 77-207. Instead, this could reasonably be interpreted as further evidence that the definitions in K.S.A. 2024 Supp. 77-207 did not alter the KDOR's interpretation of gender in the Motor Vehicle Drivers' License Act.

But the Legislature has not enacted legislation consistent with the AG's argument that gender and sex mean the same thing. Instead it seems to be attempting to clarify the difference between those two terms, although we provide no opinion as to whether the new legislation accomplishes this imputed goal.

Again, there could be a reasonable argument made that these statutes, adopted after this litigation was filed, point to an understanding by the Legislature that the words gender and sex have different meanings. And no amendments were made to K.S.A. 8-240, K.S.A. 8-243, or K.S.A. 2024 Supp. 77-207 during the 2025 legislative session.

We find this conclusion—that the Legislature knew the two words were not synonymous and chose not to legislatively make them so—to be a more reasonable construction than the AG's conclusion—that the Legislature had no idea that there was a difference in the two definitions and thus unambiguously intended gender to be included in the new definition of "sex." Thus we cannot say that, at this stage, the AG has shown there is a substantial likelihood that he will eventually prevail on the merits of his interpretation. In holding otherwise, the district court abused its discretion by committing an error of law.

6. *The KDOR's argument in the district court that a writ of mandamus may not be invoked to control discretion*

Mandamus is not available to require performance of an act that involves the exercise of discretion by the public official. *Ambrosier*, 304 Kan. at 911.

51

"The only acts of public functionaries which the courts ever attempt to control by either injunction or mandamus, are such acts only as are in their nature strictly ministerial; and a ministerial act is one which a public officer or agent is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, and without regard to his own judgment or opinion." *Martin, Governor, v. Ingham*, 38 Kan. 641, 651, 17 P. 162 (1888).

That does not mean that some other civil action might not be available to decide the correctness of an official's interpretation of the law, but mandamus is not one of them.

Here the State is seeking an order requiring the KDOR to only issue driver's licenses to persons with a sex marker that meets the definition in K.S.A. 2024 Supp. 77-207. The KDOR is statutorily required to accept original applications for valid driver's licenses and approve such applications if "applicable requirements of the motor vehicle drivers' license act have been complied with . . . which license *shall* be issued as provided in this act." (Emphasis added.) K.S.A. 8-235b. The use of the term "shall" certainly connotes a mandatory or ministerial action, not a discretionary one.

But the Director of Vehicles is charged with the administration of the Division. K.S.A. 75-5110. The process of issuing a driver's license can require the review of many documents that may or may not be consistent.

There is a reasonable argument that this day-to-day application of judgment to each applicant's specific circumstances is a discretionary function. The examiner must consider and weigh contrasting identity documentation. Additionally, the driver's license examiner may have to factor in medical documentation of what constitutes sex development diagnosis or associated conditions provided by a treating physician. This is so even if the court accepts the AG's argument that "gender" in K.S.A. 8-240 and K.S.A. 8-243 means the same as "sex" in K.S.A. 2024 Supp. 77-207. Let's examine the KDOR's position further.

First, the KDOR must exercise discretion because of the unique definition of sex provided in K.S.A. 2024 Supp. 77-207(a)(2):

> "[A] 'female' is an individual whose biological reproductive system **is developed** to produce ova, and a 'male' is an individual whose biological reproductive system **is developed** to fertilize the ova of a female." (Emphases added.)

The use of present perfect tense, "is developed," versus future tense, "will develop," forces a discretionary decision from the KDOR. For example, if an applicant who would, under common usage, be known as "female" but does not have a reproductive system that *is developed* to produce ova, how will the KDOR report the applicant's sex? And what if an applicant who, under common usage, would be known as a male, but *has not developed* a reproductive system to fertilize the ova of a female? He would not be a male, and if he does not have a reproductive system that *has developed* to produce an ova, he would not be a female either. Would he simply not be entitled to a driver's license at all because he does not fit the statutory definition of male or female? The AG conceded in oral argument that this is a small subset of people and such decisions would be relegated to the KDOR's discretion. But the decision of which sex or which address or which of the other physical characteristics is on the face of a driver's license is either a discretionary decision or it is not.

The KDOR's discretion is further illustrated by the fact that K.S.A. 2024 Supp. 77-207(a)(7) seems to recognize that individuals "[may be] born with a medically verifiable diagnosis of 'disorder/differences in sex development'" although it does not appear to give any definitional significance to that concession. Is the KDOR to interpret this to mean that the Legislature recognizes that the reproduction system may not be developed at birth? Is it *only* if the reproductive system has fully developed, as the plain language of K.S.A. 2024 Supp. 77-207(a)(2) states, that it must classify a person as male or female? If

53

an applicant asks the examiner, "What should I put down?" is the answer a discretionary one for the examiner?

This decision is not as easy as it seems. Our Supreme Court listed a wide variety of options in *Gardinier*, 273 Kan. at 209. And, as already noted, even our Kansas statutes contain differing definitions of "sex." The KDOR will have to use its discretion to determine what sex should be listed on a driver's license in cases that are not clearcut.

Second, the KDOR exercises direction when reviewing a multitude of other documents, both state and federal, that may not define "sex" in the same way Kansas does. United States passports, documents accepted by the KDOR as proof of identity, lists sex as M, F, or X, which denotes unspecified or other gender identities. See K.S.A. 8-246 (replacement driver's licenses); K.S.A. 8-1326 (identification cards). In fact many Kansas statutes accept a United States passport as proof of identity. See K.S.A. 2024 Supp. 50-6,110 (metal dealers); K.S.A. 25-2908 and K.S.A. 25-2309 (voting); K.S.A. 2024 Supp. 53-5a07 (notary public); K.S.A. 2024 Supp. 73-1244 (veteran's benefits); K.S.A. 65-3428 (plastics dealers); K.S.A. 2024 Supp. 65-1958 (demonstration permits). And as already stated, at least 45 other states allow gender reclassification on their driver's licenses. And many states likewise allow gender reclassification on one's birth certificate. The AG indicated at oral argument that he had no idea how the KDOR would handle people seeking a Kansas license who had a valid out-of-state license from one of those states. And even recent legislation notes that biological sex may not be identifiable at birth. See S.B. 63, L. 2025, ch. 1, § 3. This all points to the necessary exercise of discretion by the KDOR, even if it interprets sex and gender to be synonymous.

If a mandamus action is not proper when the action of the official involves discretion and a reasonable interpretation of the KDOR's decisions related to the issuance of driver's licenses is that they are discretionary, then the State would not prevail on the merits. There is an equally compelling argument that the mere use of the word "shall" in

K.S.A. 8-235b makes the KDOR decision to issue a driver's license a ministerial one. We are not prepared to find that this argument tips the balance in favor of the KDOR or the AG.

CONCLUSION

Given that the State is required to meet all five prerequisites for a temporary injunction, and they have not met at least two, there is no need to examine the other three. Because we have found that the State will suffer no harm, there is no need to balance the harm the injunction will impose on the KDOR or the Intervenors. The State failed to meet its burden to establish the invocation of this extraordinary remedy. Because of the district court's abuse of discretion the KDOR has been unable to issue reclassifications of gender designations on Kansas driver's licenses for two years while this litigation languished.

Today, we reverse the district court's issuance of the injunction. The KDOR is free to proceed as it has since at least 2007 until a determination is made on the merits of the AG's claim either in this litigation or subsequent litigation that may follow.

Likewise, because we find at least two prerequisites for an injunction have not been met, independent of any claim regarding the constitutionality of the statute and the theory of constitutional avoidance, there is no need for us to address the claims of the Intervenors. Those issues will be considered by the district court when a full hearing is provided on the merits of the claims.

And finally, because the district court has already stated its opinion on the merits of the Intervenors' constitutional claims, we remand the case for hearing before a new judge. See *In re Estate of Lentz*, 312 Kan. 490, 507, 476 P.3d 1151 (2020) (Luckert, C.J., Biles, J., and Stegall, J., concurring) (when courts opine on issues not properly before them, they tilt the playing field, and the appellate court should appoint a new judge to

55

consider the issue). And because any rulings regarding the admission of expert testimony related to the hearing on the merits will be at the discretion of the new judge, we need not address the failure to allow the expert testimony of Dr. Beth Oller at the injunction hearing.

Reversed and remanded with directions.